**Sally GROSS, Plaintiff,**

v.

**UNITED STATES SMALL BUSINESS ADMINISTRATION and J. Wilson Harrison, District Director of the United States Small Business Administration, Defendants.**

**No. 80–CV–454.**

United States District Court, N.D. New York.

Aug. 12, 1987.

John Michael Caster, Auburn, N.Y., for plaintiff.

Frederick J. Scullin, Jr., U.S. Atty., Syracuse, N.Y. (Gustave J. DiBianco, Asst. U.S. Atty., of counsel), for defendants.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

This is an action pursuant to § 701(a)(1) of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691(a)(1). A non-jury trial was held between April 27 and May 4, 1987. The following constitutes this court's opinion consistent with Fed.R.Civ.P. 52.

## I. BACKGROUND

On June 12, 1980, plaintiff, Sally Gross, filed suit against the United States Small Business Administration (SBA) and its District Director, J. Wilson Harrison. Suit was brought pursuant to the ECOA alleging that the SBA and Harrison discriminated against the plaintiff on the basis of sex or marital status in their denial of her loan applications. In particular, plaintiff complained that credit applications she had made in 1975, 1976 and 1977 were improperly denied. In addition, she alleged that February 9, 1978 reconsideration regarding the 1977 loan application was denied on the basis of her sex or marital status.

At a motion term held on January 25, 1982, this court dismissed all of the plaintiff's claims as untimely. 15 U.S.C. § 1691e(f) requires an ECOA action to be brought within two years of accrual. The court determined that the SBA's denials had occurred on November 3, 1975, October 26, 1976, October 7, 1977 and May 2, 1978 (all more than two years prior to this suit). In so doing, the court determined that a June 15, 1978 letter from the SBA to the plaintiff did not constitute a denial by the SBA. The court opined that the June 15 letter was merely a courtesy because the May 2 rejection was proper under the applicable law and regulations. Consequently, the court determined that even the plaintiff's most recent cause of action dealing with the 1978 reconsideration accrued on May 2, 1978; and, that this action, commenced on June 12, 1980, was time-barred.

The Court of Appeals for the Second Circuit reversed and remanded. While the Court of Appeals agreed that the May 2 letter was an effective denial, and could

have started the limitations clock, it determined that there were questions of fact concerning whether the SBA had reconsidered the plaintiff's loan application between May 2, 1978 and June 15, 1978:

> If the agency was merely considering whether to entertain an application for reconsideration, the finality of the May 2 denial would not have been disturbed, and the statute of limitations would have run. On the other hand, if the agency had elected to entertain an application for reconsideration and still had under advisement the merits of the loan application within two years of the date of the complaint, then the complaint would be timely.

*Gross v. United States Small Business Administration*, No. 82–6043, slip. op. at 4. (2d Cir. June 29, 1982) [697 F.2d 290 (Table)].

On remand, the defendants moved: for dismissal of the claims against the SBA asserting that the United States did not waive its sovereign immunity with respect to ECOA claims; for dismissal of the 1975, 1976, and 1977 causes of action as time-barred; and, for summary judgment. This court, in an oral opinion and in an Order dated December 24, 1986, denied the motion to dismiss based on sovereign immunity; dismissed the 1975, 1976 and 1977 causes of action;[1] and, denied the summary judgment motion.

The court also held a separate bench trial pursuant to Fed.R.Civ.P. 42(b) on the statute of limitations as applied to the 1978 reconsideration. From that trial, the court determined that between May 2 and June 15, 1978, the SBA was not merely considering whether to entertain an application for reconsideration of its May 2 rejection, but had elected to entertain such an application and still had under advisement the merits of plaintiff's loan request. Consequently, the court held that plaintiff's cause of action with regard to the 1978 reconsideration did not accrue until June 15, 1978; and, that plaintiff's suit with regard to that claim was timely. The court next conduct-

ed a four-day, non-jury trial on the merits of that claim. The following constitutes the court's findings of fact and conclusions of law relative thereto.

## II.  RELEVANT LAW

Plaintiff's ECOA claim derives from 15 U.S.C. § 1691 which provides, in pertinent part:

> (a) Activities constituting discrimination. It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—
>> (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)

The SBA and Harrison are creditors within the meaning of the ECOA. *See* 15 U.S.C. § 1691a(e) and (f).

Plaintiff may establish her ECOA claims in a manner similar to that used in Title VII discrimination cases. *Bhandari v. First Nat. Bank*, 808 F.2d 1082, 1100–1101 (5th Cir.1987); *Williams v. First Fed. Sav. & Loan Ass'n*, 554 F.Supp. 447, 448–49 (N.D.N.Y.1981), *aff'd*, 697 F.2d 302 (2d Cir. 1982). The plaintiff may ground her case on either a disproportionate impact theory under *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), or a disparate treatment analysis under the widely held test articulated in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff has urged this court to go beyond these two traditional tests, however. The court declines the invitation. Plaintiff relies on *Miller v. American Express Co.*, 688 F.2d 1235 (9th Cir.1982) for the proposition that the ECOA does not always limit proof of credit discrimination to the two traditional Title VII tests. That may be so. The question, however, is whether this case is best governed by those tests.

The court notes that other courts have generally required proof in ECOA cases to conform to the traditional Title VII tests. *See e.g., Bhandari*, 808 F.2d at 1100–1101;

---

1.  This dismissal merely reaffirmed those portions of the court's decision of January 25, 1982

which were undisturbed by the Court of Appeals.

*Williams,* 554 F.Supp. at 448–49; *Sayers v. General Motors Acceptance Corp.,* 522 F.Supp. 835, 839–40 (W.D.Mo.1981); *Cragin v. First Fed. Sav. & Loan Ass'n,* 498 F.Supp. 379, 384 (D.Nev.1980); *Vander Missen v. Kellog-Citizens Nat. Bank,* 481 F.Supp. 742 (E.D.Wisc.1979). *Miller* is the exception and not the rule; and, the present case is distinguishable from *Miller.* The defendant in *Miller* was liable for discrimination because it violated a specific regulation promulgated pursuant to the ECOA. 12 C.F.R. § 202.7(c) specifically proscribes a creditor from terminating a person's account merely on the basis of a change in marital status absent evidence of inability or unwillingness to pay. In *Miller,* the defendant, American Express Company, terminated the plaintiff's account due to the death of her husband in violation of section 202.7(c). Under those circumstances, the *Miller* court did not require a specific finding of discriminatory intent. The regulation in question there had been duly promulgated by the Board of Governors of the Federal Reserve System (the "Board"). The Board had already determined that such conduct was discriminatory. Given this determination, the *Miller* court did not need to find discrimination through the ordinary means. We have no such determination of the Board here. The burden shifting devices of Title VII case law, which are utilized to assist plaintiffs in proving their cases, *see Loeb v. Textron,* 600 F.2d 1003, 1014–15 (1st Cir.1979), are appropriate here.

There was little or no evidence produced at trial which would support a disparate impact claim, and plaintiff admitted in her closing argument that the proof was best analyzed under the disparate treatment test of *McDonnel Douglas.* Consequently, the plaintiff must present facts from which one can infer that the actions taken by the defendants, if unexplained, more likely than not were the result of unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). To meet this *prima facie* burden, she must offer proof that:

(1) she belongs to a minority or protected class,

(2) she applied for and was qualified for a loan,

(3) despite her qualifications she was rejected, and

(4) males or married females of similar credit stature were given loans, or were treated more favorably than plaintiff in the application process.

*See Sayers,* 522 F.Supp. at 839–40; *Cragin,* 498 F.Supp. at 384. If she is successful, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for the denial of credit. *Sayers,* 522 F.Supp. at 840. If the defendants produce such evidence, the plaintiff may still prevail if she can prove by a preponderance of the evidence that a discriminatory reason more likely motivated the defendants, or that the defendants' profferred explanation is unworthy of credence or is a pretext for discrimination.

### III. APPLICATION OF THE RELEVANT LAW TO THE PRESENT CONTROVERSY

Plaintiff, a licensed real estate broker, established her real estate business in 1968. She operated out of her home from 1968 through some time in 1974 when she purchased an office located at 6888 E. Genesee Street, Fayetteville, New York. In 1975, with an eye toward expanding her business, the plaintiff sought bank financing guaranteed by the SBA. When the bank refused to grant her request, she turned to the SBA for direct financial assistance. She made an application to the SBA for an $100,000 loan on September 3, 1976, which was denied. She then made an application for a $95,000 loan on June 15, 1977, which was also denied. After the latter denial she sought reconsideration of her 1977 application by letter dated February 9, 1978. This reconsideration request was in the amount of $153,583.56, revised from the 1977 request for $95,000. Her application was again rejected.

As noted previously, the only claim before this court is whether the plaintiff's 1978 reconsideration request was denied because of her sex or marital status. Con-

sequently, facts concerning that request and denial are most probative. Facts concerning the earlier applications provide background information, however, and will be noted where necessary.

## A. *Prima Facie Case*

■ The court finds that the plaintiff has failed to establish a *prima facie* case of improper discrimination under the ECOA. While the plaintiff has clearly proved that she is a member of a protected class and that she unsuccessfully applied for credit from the defendants, there is considerable question about whether she has demonstrated that she was qualified for a loan, and that males or married females of similar credit stature were given loans, or were treated more favorably than plaintiff in the application process.

*For the purpose of evaluating her prima facie case only*, the court resolves the question of the plaintiff's loan qualifications in her favor. According to her testimony, she had adequate collateral to secure the loan, and she projected adequate income to service the resulting debt. Moreover, Sandra Lynn Massey, a certified public accountant with some familiarity with SBA loans, testified that the accounting information contained in plaintiff's 1978 reconsideration, although unusually organized, presented sufficient information on which to grant an SBA loan.

The court cannot resolve the question about plaintiff's proof of the fourth element of the *prima facie* case in her favor, however. Ms. Gross offered scant evidence to demonstrate that males or married females of similar credit stature were given loans, or were treated more favorably than her in the application process. Plaintiff's proof in regard to this element of her case was primarily concerned with the SBA's approval of a 1978 loan application made by a male, Pat Bombard, in the name of Pat Bombard Buick, Inc. Plaintiff asserts that this "male" application was similar to hers in amount and in that Bom-

bard, like plaintiff, had had some credit problems. (The SBA loan officer's report on the Bombard application and on plaintiff's 1976 application indicated that the SBA was concerned with the "payment slowness" of both individuals.) Unfortunately for the plaintiff, the similarity ends here. First, Bombard's business was considerably different than that of the plaintiff. Bombard operated a retail automobile dealership. The SBA, or any other lender, would be concerned with Bombard's cost of carrying inventory, inventory turnover, inventory financing, etc. The plaintiff's business was, on the other hand, service oriented. Lenders would be concerned with a different set of data with respect to such a business. Second, and most important, the loan officer's report on Bombard's 1978 loan indicates that Bombard had overcome an earlier debt problem by selling financed property.[2] There is no indication that plaintiff had overcome debt problems in a similar or other manner.

The plaintiff has failed to demonstrate that she and Bombard were of similar credit stature. Consequently, the court refuses to attach any significance to the fact that Bombard was granted a loan and the plaintiff was not. Ms. Gross also offered the deposition testimony of Thomas Butler, one of her accountants. Mr. Butler stated that he was required by the SBA to provide several copies of Ms. Gross' tax returns, whereas he was not required to do so in the case of male applicants with whom he was familiar. To infer sex discrimination from such an administrative detail would strain the bounds of reason.

## B. *Legitimate Reasons for Plaintiff's Denial*

■ Even if the court were to determine that plaintiff had established her *prima facie* case, the defendants have clearly met their burden of articulating legitimate, nondiscriminatory reasons for the denial of credit. The defendants offered an abundance of evidence to support their position

---

**2.** A 1974 Bombard application for an SBA loan guarantee was denied. Bombard's sale of encumbered property between 1974 and 1978 was

a significant factor in the SBA's approval of the 1978 application.

that all of plaintiff's applications, including the 1978 reconsideration in issue here, were denied because the defendants rightfully considered the plaintiff to be a credit risk, not because of her sex or marital status.

When plaintiff applied for direct loans from the SBA in 1976, 1977, and 1978, she was delinquent on a SBA loan of $10,000 granted in 1968. Because plaintiff demonstrated an inability to timely make the relatively small debt service payments of $109 per month on this loan, the defendants were understandably concerned about her ability to make payments roughly tenfold that amount.

Moreover, a comparison of plaintiff's financial statements and accounting ratios derived therefrom with standard ratios for comparable real estate businesses demonstrates that the defendants' concern about plaintiff's repayment ability was understandable. Compared to other comparable businesses analyzed by Robert Morris Associates,[3] plaintiff's business was highly leveraged in that debt to net worth ratios for the plaintiff's business were at least five times that of the reported average. It is easy to see that any lender, including the SBA, would be concerned with a loan applicant who was so heavily burdened.

The defendants also adequately demonstrated that they were genuinely concerned about the amount of unencumbered collateral available to serve as security for the requested loans. As part of her 1978 reconsideration request, the plaintiff submitted an appraisal for her investment property, Yorkshire Manor, in the approximate amount of $1,000,000. Plaintiff listed three prior liens against Yorkshire Manor, however, totalling $670,000. In addition, the SBA was informed by plaintiff that Merchant's Bank had an additional lien against the property, but that the bank would subordinate its interest to that of the

SBA. At best, the SBA's security would be subordinate to three liens totalling $670,000. Although over $300,000 of equity remained to secure a loan roughly half that amount, the SBA was appropriately concerned about the effect a distress sale price and the cost of foreclosure would have on its security. Moreover, the plaintiff submitted no documentary proof that Merchant's Bank would indeed subordinate its security to that of the SBA. Adding the Merchant's Bank lien to the list of liens prior to the SBA would further detract from the SBA's security.

In addition, the defendants were concerned about the plaintiff's management ability. They believed she overestimated her business' growth potential in the competitive real estate field. This overconfidence resulted in too rapid an expansion, which in turn resulted in debt that could not be serviced from income. A related concern was that plaintiff intended to use a large portion of SBA loan proceeds to service existing debt, an apparently ineligible use under SBA guidelines.

Finally, the defendants questioned the reliability of information supplied to the SBA by the plaintiff. For example, the income shown on the plaintiff's financial statements differed substantially from the income shown on her corresponding tax returns. Although the plaintiff offered some explanation for the discrepancies at trial, the court concludes that the defendants were reasonably concerned about the reliability of information supplied by Ms. Gross. Given the above, and the testimony of defendant Harrison that plaintiff's sex or marital status never entered into the SBA's consideration of her applications,[4] the court determines that the defendants have proved that they had legitimate, nondiscriminatory reasons for denying plaintiff's 1978 reconsideration request.

---

**3.** Robert Morris Associates publish a book of standard financial ratios for various businesses. This work is used regularly by the SBA and other financial institutions to assess the relative strength of loan applicants.

**4.** In an effort to contradict such statements, the plaintiff offered the testimony of an SBA employee, Raymond Werts, that George McKean, a

fellow SBA employee who had worked on the Gross applications, had once commented that "Sally Gross is a pain in the ass." Apparently the plaintiff believes that this testimony is somehow probative of sexual animus. The court notes, however, that such a descriptor may apply equally to individuals of both sexes.

**56**

### C. *Plaintiff's Rebuttal*

The plaintiff's attempts to demonstrate that a discriminatory reason more likely motivated the defendants, or that the defendants' articulated reasons for denial were a pretext for discrimination cannot be accepted by the court. Dr. Victor Garlock, a psychologist who has studied sex bias, testified on behalf of Ms. Gross in rebuttal. Dr. Garlock posits that sex bias may manifest itself in the behavior of individuals, rather than in their communications. For example, Dr. Garlock testified that if defendants had denied plaintiff's applications for different reasons each time, they may have been attempting to fabricate reasons, perhaps subconsciously, rather than reveal their true reasons for plaintiff's denial: her sex or marital status. In addition, Dr. Garlock explained a phenomenon which he termed "differential attribution." The attribution process basically involves reasoning backward from the observation of an event or behavior to a judgment about its cause. For example, one can "attribute" the success of someone to that person's intelligence. Under "differential attribution," the result differs depending on the sex of the person involved. According to Dr. Garlock, people may attribute the success of a man to his hard work or intelligence, while they may attribute the success of a woman to good luck, or some other less praiseworthy factor.

The court has no reason to quarrel with the research or theories of Dr. Garlock. They do not help the plaintiff here, however. With regard to his first theory, Dr. Garlock was asked to analyze the SBA letters informing Ms. Gross that her applications had been rejected. Dr. Garlock felt that the reasons contained therein were different enough that defendants may have been hiding their sex bias. Dr. Garlock admitted, however, that such a conclusion assumed that the plaintiff was in fact qualified for a loan. Such an assumption is clearly erroneous given the strength of the evidence described in the previous section. Moreover, the court, having had the benefit of all of the testimony (a benefit not had by Dr. Garlock), concludes that the reasons given by the defendants in the rejection letters *were not* inconsistent.

As to any "differential attribution" on the part of the defendants, Ms. Gross asserts that her persistence in pursuit of an SBA loan was viewed negatively,[5] while the persistence of a male, Bombard, was viewed positively by the SBA. Plaintiff refers the court to the SBA loan officer's report on the Bombard application, wherein the loan officer reported of Mr. Bombard: "His staying power is his strong point." Once again, the plaintiff asks this court to compare apples to oranges. The positive reference to Bombard's "staying power" was directed toward Bombard's ability to keep his automobile dealership afloat during rough times, including the Arab oil embargo of the mid–1970's, not toward his persistence in pursuing loans from the SBA.

### IV. CONCLUSION

The plaintiff has failed to establish a *prima facie* case of improper discrimination under the ECOA. Even if she had met that burden, the defendants have articulated legitimate, non-discriminatory reasons for her denial, which the plaintiff has failed to rebut. Judgment shall be entered on behalf of the defendants.

IT IS SO ORDERED.

---

5. See, for example, the comments of George McKean in note 4, *supra.*